# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN MICHAEL LOPEZ, | Case No. 1:24-cv-01060-SAB-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| KEVIN HIXTON, | ORDER DIRECTING CLERK OF COURT TO RANDOMLY ASSIGN DISTRICT JUDGE |
| Respondent. | |

Petitioner, represented by counsel, is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On November 22, 2019, Petitioner was convicted after a jury trial in the Tulare County Superior Court of discharging a firearm at an occupied vehicle, battery, and firearm possession. The jury also found various special allegations true. (ECF No. 1 at 2[1]; 2 CT[2] 361–63.) On January 23, 2020, Petitioner was sentenced to an imprisonment term of six years for battery and forty-five years to life for discharging a firearm at an occupied vehicle. The sentence for firearm possession was stayed. (2 CT 429, 431.) On May 20, 2022, the California Court of Appeal, Fifth

---

[1] Page numbers refer to the page numbers stamped at the top of the page.
[2] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on October 21, 2024. (ECF No. 8.)

1

Appellate District reversed the gang and firearm enhancements based on retroactive application of Assembly Bill 333 and affirmed the judgment in all other respects. People v. Lopez, No. F080683, 2022 WL 1596154 (Cal. Ct. App. May 20, 2022). On August 10, 2022, the California Supreme Court denied the petition for review. (LDs[3] 21, 22.)

On September 5, 2024, Petitioner commenced the instant action by filing a petition for writ of habeas corpus. (ECF No. 1.) On October 28, 2024, Respondent filed an answer. (ECF No. 10.) On November 20, 2024, Petitioner filed a traverse. (ECF No. 11.)

## II.

## STATEMENT OF FACTS[4]

### INTRODUCTION

Stephen Michael Lopez and three codefendants—Robert Ramos, Francisco Nava, and Ruben Perez—engaged in a confrontation at a convenience store with E.D. and his girlfriend, C.A. They yelled rival gang slurs at E.D., Lopez and Perez threw drinks into the car E.D. and C.A. were sitting in, and Lopez grabbed E.D.'s shirt, struck him in the back of the head, and scratched his neck. Perez also tried to grab E.D. E.D. drove away. E.D. saw a black car speeding toward him, heard two gunshots and glass breaking, and felt an impact on his car. He saw the black car on the left side of his car and the back passenger window rolled down.

. . . .

### FACTUAL BACKGROUND

*February 3, 2018 Incident*

In the evening of February 3, 2018, E.D. was at a convenience store with his girlfriend C.A.; E.D. was wearing a navy blue shirt. They met E.D.'s parents for dinner. E.D. testified codefendants Nava and Ramos approached E.D. when he was at the register checking out, though other evidence introduced suggests Ramos did not enter the store. C.A. identified Nava and Lopez as the individuals who approached E.D. inside the store. Officer Michael Elliot, who was tasked with identifying the suspects in the video surveillance footage from the convenience store, testified Nava and Lopez could be seen inside the store on the day of the incident.

Nava said, " 'What's up Ene?' " E.D. testified the statement is "like an initiation from a gang member to another gang member." E.D. smiled and said "What's up?" E.D. walked out of the store toward his car; Lopez and his codefendant Perez followed E.D. and said, " 'Fuck Sur trece.' " E.D. understood the statement to mean "disrespect toward the Southerner gang." E.D. testified all four defendants continued to yell disrespectful Southern gang slurs while E.D. and

---

[3] "LD" refers to the documents lodged by Respondent on October 21, 2024. (ECF No. 8.)

[4] The Court relies on the California Court of Appeal's May 20, 2022 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

C.A. walked toward his car. E.D. and C.A. got in the car and reversed; E.D. saw Ramos and Nava talking to his mother as she was trying to get in her car. E.D. testified his car had a Los Angeles Dodgers logo decal on it; he and C.A. denied any gang involvement. E.D. rolled his window down halfway to tell the defendants he did not want any problems but, before he could, Lopez and Perez threw drinks into E.D.'s car. Lopez then grabbed and scratched E.D.'s neck; Perez tried to grab E.D., too. E.D. drove off. As he was leaving, E.D. saw Lopez and Perez running to a black four-door sedan; he saw them get into it. He told C.A. to call 911 as he turned onto the road from the driveway. He could see the defendants' car in his rearview mirror exiting from the same driveway.

E.D. got in the far right lane. The defendants pulled up behind E.D.'s car and then next to it. E.D. heard glass breaking, tires screeching, and two gunshots. E.D. and C.A. saw the rear passenger side window of the defendants' car rolled down. E.D. drove back to the convenience store and he and C.A. waited for the police. Both E.D. and C.A. identified Lopez at the preliminary hearings and C.A. identified him in a photographic line-up following the incident.

The manager of the convenience store gave the police the surveillance videos from that day. Officer Elliot identified Perez, Ramos, Nava, and Lopez in the video shown at trial. Officer Elliot testified Ramos could be seen getting into the driver's seat at the gas station/convenience store.

*Gang Expert Testimony*

Before trial, defendant Perez moved to bifurcate the gang allegations. The court noted it would treat the objection as a joint challenge by all the defendants. The court considered the motion and tentatively denied it because the gang allegations and underlying charges overlapped. The prosecutor argued the gang evidence was intertwined with the charges, motive, and intent, and substantive evidence of it would come in with regard to the section 182.5 charge. The court noted it intended to allow the gang expert to testify about the foundational components and opinions regarding the gang allegations and asked for comments from the parties; no objections or comments were made. The court explained to the prosecutor that, "with the *Sanchez* [*People v. Sanchez* (2016) 63 Cal.4th 665] issue," she was going to have to "prove ... up individually ... with witnesses."

Officer Joel Arjona, who was assigned to the Tulare Area Regional Gang Enforcement Team in February 2018, testified as a gang expert. He discussed his experience working with gangs and how the Norteño and Sureño gangs are structured. He explained both gangs have symbols and signs used to reflect their affiliation. Norteño gang members associate with the number 14 and the color red. They use the huelga bird as a symbol of the gang. Sureño members use the color blue to represent the gang and associate with the number 13. Arjona explained the Norteño gang derives from the prison gang Nuestra Familia. Local street gang members of the Norteño gang report to an individual called a "channel." The "channel" then reports up to a member of Nuestra Familia who oversees the county. He testified Norteño members pay "taxes" that are used for the benefit of the gang. He explained the Norteño gang has different cliques or subsets that all identify with the color red and the number 14. Members of different subsets work together, communicate with one another, commit crimes together, and share information and weapons. He discussed the Norteño subset North Side Visa Boyz (or NSVB) and the symbols and tattoos they used to identify themselves. He stated all NSVB members are in Tulare County. He testified NSVB is a subset of the Norteño gang in Visalia.

Officer Arjona explained what he deemed to be "primary activities of the Norteno gang" based on his investigations and reports and from speaking to other officers and gang members. The primary activities included "a lot of criminal activities," 33 of which the Penal Code considers "gang crimes." He listed specific gang crimes he opined were primary activities of the Norteño gang including auto theft, possession of firearms, murder, attempted murder, assault, assault with deadly weapons, kidnappings, burglary, and vandalism.

He testified, based on his knowledge, training, and experience, gang members carry weapons at times to protect themselves, to intimidate, to use them, or to transport them from one location to another. They are supposed to tell each other when one is carrying a firearm "so if you get pulled over or something happens, you know what to expect." Given a hypothetical mirroring of the facts of this case, Officer Arjona testified it was his opinion such a crime was committed in association with and for the benefit of the Norteño criminal street gang. He opined, the four gang members in the hypothetical "have one common goal. Maybe they didn't necessarily know the goal when they were going to go to the stop, but eventually the goal was common."

*Predicate Offenses*

Officer Arjona testified regarding two specific predicate offenses. He discussed the murder of John Hernandez committed by Norteño gang members Jacob Robles and Julian Gonzalez at the direction of Joe Dominguez, another gang member, on May 19, 2010. Officer Arjona was familiar with the case through his research. Based on his training and experience, speaking with other officers, and reading reports, Officer Arjona testified he believed gang member Joe Dominquez directed the two other gang members to kill the victim, who was a gang dropout. The prosecutor then introduced certified copies of records from that case, *People v. Julian Gonzalez*, case No. VCF241993. The records reflect the crime was committed in Tulare County and the defendant was convicted of murder on May 15, 2012. The jury found true various enhancements, including a gang enhancement pursuant to former section 186.22, subdivision (b).

Officer Arjona then testified regarding an attempted murder that occurred at the Visalia Mall during business hours on January 27, 2012, by Adrian Esquer and Anthony Hanson. Arjona was not on duty at the time, but he researched the incident after the fact and testified "it was a gang crime." Based on his conversations with the primary detective, study of the case, and review of the contacts of the suspects involved, Arjona concluded the individuals involved were "gang members and that this was an intimidation shooting against a rival gang member. And a person who was caught in crossfire was also struck." He specifically opined Adrian Esquer was a Norteño gang member at the time he committed the offense. He further opined the offense fits within the pattern of Norteño street gang activity in Tulare County. He testified the mall shooting involved "different subsets that were working together. So just because you're part of a different subset doesn't necessarily mean that you're not friends, you're not a Norteño gang member." The People introduced the certified conviction packet for *People v. Adrian Esquer*, case No. VCF263049B for convictions of attempted murder and assault with a firearm in Tulare County, conviction date of January 31, 2014. It also reflects the jury found true gang enhancements pursuant to former section 186.22, subdivision (b).

Officer Arjona testified he reviewed 12 different gang contacts Lopez had with the police. Based on his training, knowledge, experience, and investigation of this

4

case, Officer Arjona opined Lopez was a Norteño gang member in February 2018. Multiple gang validation criteria applied to Lopez including: "the association with, admits to gang membership, named by a reliable source, which would be law enforcement officers as members of the gang unit, associates with gang members, involved in gang-related crimes, gang-associated tattoos, gang clothing or attire."

***Prior Contacts***

Several officers testified independently about contacts they personally had with Lopez.

On June 30, 2016, Officer Michael Lombardo encountered Lopez. He conducted a field interview with him, documented his tattoos, and noted he was wearing red tennis shoes. Lopez had a "Visa" tattoo across his stomach, "North Side" on his forearm, "NSVB" across his chest, one dot on one wrist and four dots on the other. Lopez did not want to answer whether he was a gang member but he denied being a dropout. He was with Nathan Licon, a northern gang member.

On July 13, 2016, Officer Austin Huerta conducted a field interview with defendant Lopez after seeing him walking in the roadway with other Norteño associates. Huerta knew Lopez to be a North Side Visa Boy and Lopez told him he was still in good standing with the gang during that encounter. Huerta documented Lopez's tattoos including an "NSVB" tattoo on Lopez's chest.

On October 30, 2016, Officers Art Alvarez and Dan Ford contacted Lopez, who was wearing a 49'ers jacket, and another individual. They appeared to be having a dispute and a stolen firearm was found on the ground nearby, approximately 10 feet from their location.

On May 10, 2017, Officer Alvarez did a field interview with Lopez during which Lopez admitted to his gang affiliation. Lopez stated "he was an active Northerner with the hood of being a Visa Boy." Officer Alverez explained that means Lopez is a Norteño, "Visa Boy is just a clique or a common hood. It's just the sub-gang that is under the Norteno gang of what he belongs to." Alvarez documented Lopez's tattoos, which included a "114 Percent Buster" tattoo on the back of his head (buster is a derogatory term for a Norteño); "Hood tested; Yard Approved" on his neck, a Tulare County mural with a big "TC" on his back, and "Visa Boyz" on the inside of each forearm.

On August 2, 2017, at the same convenience store where the charged incident began, there was a gang-related shooting involving Lopez. The People introduced surveillance video footage of the store from that day. Lopez and three known Norteño gang members were the victims of the shooting; one of them, Miguel Lopez, was shot in the stomach. Officer Bryan Scott responded to the shooting. Lopez reported to the police the "scraps" (a derogatory term use to refer to members of the Sureño gang) perpetrated the shooting.

On December 20, 2017, Officer Austin Huerta contacted Lopez in a "known Norteño hangout," smoking marijuana and drinking; Lopez was wearing all red and a 49'ers' logo. Huerta testified he had been told "SF" stands for "Scrap Free," which is why Norteños wear clothing associated with the San Francisco 49'ers. Lopez stated he was in good standing with the Norteño gang; he had new facial tattoos, including Mayan dots and bars symbolizing the number 14 on his left cheek and a huelga bird on his right cheek.

5

The People also introduced testimony about the other codefendants' prior contacts with law enforcement, focusing on incidents that had gang-related circumstances.

Lopez, 2022 WL 1596154, at *1–4.

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Tulare County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

7

1  "[A] federal court may not issue the writ simply because the court concludes in its independent
2  judgment that the relevant state court decision applied clearly established federal law erroneously
3  or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,
4  538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists
5  could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."
6  Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the
7  correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If
8  the Court determines that the state court decision is objectively unreasonable, and the error is not
9  structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious
10 effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

11  The Court looks to the last reasoned state court decision as the basis for the state court
12 judgment. Wilson v. Sellers, 584 U.S. 122, 125 (2018); Stanley v. Cullen, 633 F.3d 852, 859 (9th
13 Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the
14 reasoning from a previous state court decision, this Court may consider both decisions to
15 ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.
16 2007) (en banc). "When a federal claim has been presented to a state court and the state court has
17 denied relief, it may be presumed that the state court adjudicated the claim on the merits in the
18 absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at
19 99. This presumption may be overcome by a showing "there is reason to think some other
20 explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v.
21 Nunnemaker, 501 U.S. 797, 803 (1991)).

22  Where the state courts reach a decision on the merits but there is no reasoned decision, a
23 federal habeas court independently reviews the record to determine whether habeas corpus relief
24 is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853
25 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional
26 issue, but rather, the only method by which we can determine whether a silent state court
27 decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot
28 analyze just what the state court did when it issued a summary denial, the federal court must

review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIMS

In his two claims for relief, Petitioner asserts that there was insufficient evidence to support his convictions for shooting at an occupied vehicle and possession of a firearm. (ECF No. 1 at 15.) Respondent contends that rejecting appellate attacks on the sufficiency of the evidence was reasonable. (ECF No. 10 at 13.)

**A. Sufficiency of the Evidence Legal Standard**

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

"'After AEDPA, we apply the standards of Jackson with an additional layer of deference' to state court findings." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011) (alteration omitted) (quoting Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005)). As the Supreme Court has stated,

> Jackson . . . makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient

evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

**B. Shooting at an Occupied Vehicle**

In his first claim for relief, Petitioner asserts that there was insufficient evidence that he discharged a firearm under the theories of aiding or abetting or conspiracy. (ECF No. 1-1 at 14.) Petitioner argues that the state courts "identified the correct, governing legal rule but unreasonably applied it to the facts." (Id.) Respondent contends that Petitioner "cannot meet his exceptionally difficult burden to prevail on a sufficiency of the evidence claim under § 2254(d)." (ECF No. 10 at 13.)

This claim was raised on direct appeal to the California Court of Appeal, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Wilson, 584 U.S. at 125.

In denying the sufficiency of the evidence claim for shooting at an occupied vehicle, the California Court of Appeal stated:

> Lopez argues insufficient evidence supports his convictions for shooting at an occupied vehicle and felon in possession of a firearm. He also argues the evidence was insufficient to support the gang enhancement. We address and reject each of defendant's contentions in turn.
>
> **A. Standard of Review**
>
> " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

10

**B. Sufficient Evidence Supports Lopez's Conviction for Shooting at an Occupied Vehicle**

Lopez first contends there was insufficient evidence he aided and abetted the shooting or that he could be liable for count 3 as a coconspirator. We disagree.

*1. Applicable Law*

Section 246 provides in pertinent part: "Any person who shall maliciously and willfully discharge a firearm at an .... occupied motor vehicle, ... is guilty of a felony...." "A violation of section 246 is a general intent crime." (*People v. Ramirez* (2009) 45 Cal.4th 980, 985, fn. 6; see *People v. Iraheta* (2014) 227 Cal.App.4th 611, 620; *People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1500.)

To establish that a defendant is guilty of an offense as an aider and abettor, the prosecution must demonstrate that the defendant " 'acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.]' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; accord, *People v. Mendoza* (1998) 18 Cal.4th 1114, 1123; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.)

" 'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. ...[¶] ... [¶] Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Nguyen, supra*, 61 Cal.4th at p. 1054; accord, *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *In re Jessie L.* (1982) 131 Cal.App.3d 202, 217.) " 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' [Citation.]" (*People v. Nguyen, supra*, at p. 1055.)

" 'Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy. [Citations.] A conspiracy requires (1) the intent to agree, and (2) the intent to commit the underlying substantive offense.' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 870.) " 'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 515–516; accord, *People v. Homick, supra*, at p. 870 [" ' "The punishable act, or the very crux, of a criminal conspiracy is the evil or corrupt agreement." ' [Citation.] [¶] If the agreement between the conspirators is the crux of criminal conspiracy, then the existence and nature of the relationship among the conspirators is undoubtedly relevant to whether such agreement was formed, particularly since such agreement must often be proved circumstantially"]; *People v. Ware* (2020) 52 Cal.App.5th 919, 940 ["Incidents occurring before the start of the conspiracy may be considered as circumstantial evidence supporting the existence of the conspiracy"].)

11

*2. Analysis*

Lopez contends, to the extent his conviction of count 3 for shooting at an occupied vehicle was based upon an aiding and abetting theory, the prosecution needed to prove he knew Nava was armed with a gun and that Lopez "in some way promoted Nava's use of it," but there was no evidence to support those conclusions. He argues any inference the defendants discussed shooting at E.D.'s car was "pure speculation." He further asserts the evidence was insufficient to establish he and his codefendants agreed to shoot at E.D.'s vehicle as necessary to support a conviction based on a conspiracy theory. On reply, he relies upon the Ninth Circuit Court of Appeals case, *Mitchell v. Prunty* (9th Cir. 1997) 107 F.3d 1337, in support of his contentions.[5] We conclude sufficient evidence supports this conviction.

Here, the jury was instructed it could convict Lopez of shooting at an inhabited vehicle under an aiding and abetting theory or as a coconspirator. And our review of the record reveals substantial evidence from which a rational trier of fact could have found Lopez guilty of this count beyond a reasonable doubt based on an aiding and abetting theory. The same evidence of Lopez's and the other defendants' conduct, relationship, interest, and activities before and during the offense, when viewed in the light most favorable to the judgment, also provides sufficient evidence to support a conclusion Lopez conspired to commit the shooting at E.D.'s vehicle.

The evidence at trial, including the surveillance footage of the events giving rise to the charges and testimony of the victims and officers, support a conclusion Lopez and Nava entered the store and instigated the initial confrontation with E.D. Lopez and Perez then escalated the verbal confrontation to a physical one by approaching E.D.'s car, grabbing and scratching him, and throwing their drinks at him. The surveillance footage shows the defendants hanging out together outside the gas station area, Perez staring at E.D. and C.A., and the roles each defendant assumed during the initial confrontation at the convenience store. It also can be viewed as depicting Lopez and Nava entering the backseat of the car after the initial confrontation at the gas station and before the defendants' car pursued E.D.'s car. The victims' testimony provided evidence two shots were fired from the defendants' car, the window of the backseat passenger of the defendants' car was down, and the defendants then fled. The prosecution also introduced significant evidence of the defendants' gang affiliation, which related to the defendants' relationship to one another, as well as evidence of the gang rivalry between Norteños and Sureños, and expert testimony regarding how crimes were typically executed by gang members, including that members typically notify others in the car with them if they are in possession of a weapon. There was also evidence Lopez was previously attacked by members of the rival Sureño gang at the same convenience store gas station six months before the charged incident, and E.D. appeared to be wearing rival gang colors on the night of the crime.

Considering all of this evidence together in the light most favorable to the verdict, it was reasonable for the jury to infer beyond a reasonable doubt Lopez intended to aid and abet the shooting at E.D.'s vehicle. (See *People v. Nguyen, supra*, 61 Cal.4th at p. 1055 [substantial evidence supported jury's conclusion defendant aided and abetted attempted murder where he was passenger in car waiting in parking lot before pursuing victim's car; defendant stared at occupants in victim's car as they passed it; fellow gang member shot at victim's car from front seat; and

---

[5] This case was overruled on other grounds in *Santamaria v. Horsley* (9th Cir. 1998) 133 F.3d 1242, 1248.

gang expert testified to existing gang rivalry].). The jury could also reasonably conclude from this same evidence that Lopez conspired with the other defendants to commit the shooting. (See *People v. Jurado* (2006) 38 Cal.4th 72, 121 ["[a]lthough there is no direct evidence that defendant and [an accomplice] discussed in advance the killing of [the victim], there was evidence that they were alone together ... shortly before the killing, during which a discussion and agreement could have taken place," from which jury could infer defendant and accomplice(s) had specific intent to agree or conspire to murder victim].)

In so holding, we disagree with Lopez's suggestion there needed to be direct evidence Lopez was aware a codefendant was armed. Rather, this fact could be inferred from the record presented. (See *People v. Nguyen, supra*, 61 Cal.4th at p. 1055 [expert testimony regarding relevant gang rivalry and customary behavior including driving around " 'hunting for their rivals,' " in context with "defendant's act of staring at the occupants of [the victim's] car—followed by his car's maneuver in an out of the restaurant parking lot—could have supported the inference that defendant was aware of the impending shooting and acted to facilitate it by identifying [the rival gang] members riding in [the victim's] car"].)

In so holding we conclude *Mitchell v. Prunty, supra*, 107 F.3d 1337, relied upon by Lopez, is distinguishable. In *Mitchell*, the Ninth Circuit concluded there was insufficient evidence the defendant aided and abetted a gang-related murder as there was no evidence he rendered any assistance or encouraged the driver who ran over the gang rival and crushed the victim. (*Mitchell*, at p. 1342.) The Ninth Circuit stated, "Membership in a gang cannot serve as proof of intent, or of the facilitation, advice, aid, promotion, encouragement or instigation needed to establish aiding and abetting." (*Ibid.*)

Unlike in *Mitchell*, Lopez was not convicted of this offense solely based upon his presence in the car and his gang membership. Rather, evidence of his conduct before and after the shooting, coupled with evidence of his motive, gang membership, and relationship to the other defendants, provided substantial evidence from which the jury could infer he conspired or aided and abetted the offense. (See *People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [" '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense' "]; *People v. Mejia* (2012) 211 Cal.App.4th 586, 607–610 [affirming multiple gang members' convictions for murder as aiders and abettors, including member who reluctantly went with others to rival's residence " 'to have [his friend's] back' "]; accord, *People v. Superior Court* (*Quinteros*) (1993) 13 Cal.App.4th 12, 20 [noting common gang membership can comprise part of the circumstantial evidence supporting the inference of a conspiracy].)

We reject defendant's first contention.

Lopez, 2022 WL 1596154, at *5–7 (footnote in original).

Petitioner asserts that the prosecution "failed to demonstrate that the vehicle's occupants, including Petitioner, came to any understanding prior to the shooting or even knew that Nava possessed a gun and intended to engage in this behavior," arguing that the prosecution's "suggestion that the vehicle's occupants formed an agreement or understanding between the time

13

they departed the Circle 7 and the time of the shooting is based entirely on speculation, and not the evidence or circumstances of the case." (ECF No. 1-1 at 19.)

Viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, the evidence at trial, including surveillance footage, showed that: Petitioner and Nava[6] entered the store and approached E.D.[7] (4a RT 234–36, 291–92); they followed E.D. out the store and yelled disrespectful Southern gang slurs while E.D. and C.A. walked towards E.D.'s car[8] (4a RT 240); E.D. rolled his window down halfway and Petitioner and Perez threw drinks into E.D.'s car (4a RT 243–45, 295–96, 325; 5 RT 386–87, 391); Petitioner then grabbed and scratched E.D.'s neck (4a RT 243–45, 297, 325; 5 RT 382); as E.D. drove off, he saw Petitioner and Lopez running toward their vehicle, a black four-door sedan (4a RT 248); Ramos was driving the vehicle, Perez sat in the front passenger seat, the rear passenger side door swung open, and Petitioner got in followed by Nava (7 RT 827–28); E.D. got into the far right lane and defendants pulled up behind and then next to E.D.'s car (4a RT 250, 300); E.D. heard glass breaking, tires screeching, and two gunshots (4a RT 251); E.D. and C.A. saw the rear passenger side window of the defendants' car rolled down (4a RT 252); one bullet struck the driver's side rear quarter panel, the other bullet struck the driver's side front door, and the driver's side window was shattered (5 RT 380–81).

At trial, the prosecution's gang expert testified regarding the rivalry and violence between the Norteño and Sureño gangs and that Norteños associate with the color red while Sureños associate with blue. (3 RT 104, 108–110.) The expert testified about the structure, culture, and hierarchy of the Norteño gang, including that members are supposed to tell each other when one is carrying a firearm. (3 RT 90–91.) Additionally, officers testified about contacts they personally had with Petitioner, including on August 2, 2017, at the same convenience store where Petitioner and three known Norteño gang members were the victims of a shooting that resulted in one of them being shot in the stomach. (6 RT 533–37, 616–17.)

---

[6] E.D. identified the men in the store as Ramos and Nava. (4a RT 234–36.) C.A. identified them as Petitioner and Nava. (4a RT 291–92.) The store clerk identified the men in the store as Petitioner and Ramos. (4a RT 183–84.) The surveillance video shows that Petitioner and Nava walked into the store. (6 RT 539.)

[7] E.D. was wearing a navy blue shirt. (4a RT 245.)

[8] E.D.'s car had a Dodgers decal on the back. (4a RT 246.)

1  Petitioner told the responding officer that the shooters were "scraps," a derogatory term for
2  Sureños. (6 RT 617–18.) The expert further testified that a second shooting (where Norteños
3  shoot at Sureños) after an initial shooting (where Sureños shot at Norteños) "shows the benefit of
4  retaliation" to the Norteño gang. (6 RT 717.) The expert also testified that when more than one
5  gang member is committing a crime, the gang members have specific roles in the execution of
6  the crime. (6 RT 719–20.)

7    "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a
8  conviction." Ngo, 651 F.3d at 1114 (internal quotation marks omitted) (quoting Walters v.
9  Maass, 45 F.3d 1355, 1358 (9th Cir. 1995)). Evidence of Petitioner's confrontational conduct
10 leading up to the shooting, the previous attack against Petitioner by rival Sureño members at the
11 same convenience store and Petitioner's possible motive, his gang membership, his relationship
12 with the other defendants, and the fact that E.D. was wearing rival gang colors all support the
13 jury's verdict. "The jury in this case was convinced, and the only question under Jackson is
14 whether that finding was so insupportable as to fall below the threshold of bare rationality."
15 Coleman, 566 U.S. at 656.

16   The Supreme Court has "made clear that Jackson claims face a high bar in federal habeas
17 proceedings because they are subject to two layers of judicial deference." Coleman, 566 U.S. at
18 651. "When the deference to state court decisions required by § 2254(d) is applied to the state
19 court's already deferential review," Cavazos, 565 U.S. at 7, the Court finds that the state court's
20 decision denying Petitioner's sufficiency of evidence claim regarding shooting at an occupied
21 vehicle was not contrary to, or an unreasonable application of, clearly established federal law,
22 nor was it based on an unreasonable determination of fact. The decision was not "so lacking in
23 justification that there was an error well understood and comprehended in existing law beyond
24 any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Petitioner has not
25 demonstrated that "no 'fairminded juris[t]' could have reached the same judgment as the state
26 court." Shinn v. Ramirez, 596 U.S. 366, 378 (2022) (alteration in original) (quoting Harrington,
27 562 U.S. at 102). Accordingly, Petitioner is not entitled to habeas relief on his first claim.
28 ///

**C. Possession of Firearm**

In his second claim for relief, Petitioner asserts that there was insufficient evidence that he possessed a firearm. (ECF No. 1-1 at 20.) Petitioner argues that the state courts "identified the correct, governing legal rule but unreasonably applied it to the facts." (Id.) Respondent contends that Petitioner "cannot meet his exceptionally difficult burden to prevail on a sufficiency of the evidence claim under § 2254(d)." (ECF No. 10 at 13.)

This claim was raised on direct appeal to the California Court of Appeal, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Wilson, 584 U.S. at 125.

In denying the sufficiency of the evidence claim for possession of a firearm, the California Court of Appeal stated:

> **C. Sufficient Evidence Supports Lopez's Conviction for Felon in Possession of a Firearm**
>
> Defendant next challenges his conviction for being a felon in possession of a firearm, arguing there was no evidence to support the jury's finding that he possessed a firearm. Again, we disagree.
>
> *1. Relevant Procedural Background*
>
> Lopez was charged with one count of possession of a firearm by a felon. (§ 29800, subd. (a)(1); count 6.) The prosecution introduced certified records of Lopez's prior felony conviction for assault with great bodily injury with a gang allegation, with a conviction date of November 16, 2011.
>
> The court instructed the jury with a tailored version of CALCRIM No. 2510 stating, in part:
>
>> "To prove Defendant Lopez is guilty of this crime, the People must prove that:
>>
>> "One, he possessed a firearm; [¶] Two, he knew that he possessed a firearm; [¶] And three, he had previously been convicted of a felony. [¶] ... [¶]
>>
>> "Two or more people may possess something at the same time. A person does not have to actually hold or touch something to possess it. It is enough if the person had control over it or the right to control either personally or through another person."

The prosecutor then argued, with regard to the charge for possession of a firearm by Lopez:

> "Count 6 is felon in possession of a firearm. Again, this only applies to Defendant Lopez. I must prove that he possessed a firearm. He knew he possessed a firearm, and he previously had been convicted of a felony. You have his certified records pertaining to his felony conviction, so that element has been established. The issue will be whether he possessed it, right? And he knew he possessed it, because no one saw a firearm in that case. But you don't need someone to get on that stand and tell you I saw a firearm, to know that a gun was used in this case by four Norteno gang members.
>
> "So how do we know that he possessed it? Well, the law tells you two or more people may possess something at the same time. A person does not actually have to hold or touch something to possess it. It is enough if the person has control over it or the right to control it either personally or through another person.
>
> "And that is what we have here. We have Defendant Lopez getting in the backseat of the car, followed by Defendant Nava. We know that backseat window was rolled down. That shot came from the backseat where those two were seated. They are active Norteno criminal gang members.
>
> "Officer Arjona told you that the Norteno gang, they have to put each other on notice when one of them is carrying. That is when the Norteno gang members go out to commit a crime. They all aren't carrying. It only takes one person to shoot a gun. One person, but they are acting as a unit. They are acting together. They have control over that because they are in corroboration because they are the ones executing that situation, and that's what we have here."

### *2. Applicable Law*

Subdivision (a)(1) of section 29800 provides, in relevant part, "Any person who has been convicted of a felony ... and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." "Possession may be physical or constructive, and more than one person may possess the same contraband." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410; accord, *People v. Williams* (2009) 170 Cal.App.4th 587, 625.) "Possession may be imputed when the contraband is found in a place which is immediately accessible to the joint dominion and control of the accused and another." (*People v. Miranda, supra*, at p. 410; accord, *People v. Newman* (1971) 5 Cal.3d 48, 53, disapproved on another point in *People v. Daniels* (1975) 14 Cal.3d 857, 862.)

### *3. Analysis*

The parties dispute whether sufficient evidence supports the jury's conclusion Lopez "possessed" the gun. Lopez contends there was no evidence he had actual or constructive possession of the gun. He asserts there was no evidence he even knew a codefendant had a gun or that Lopez had the right to control it. Lopez argues, "At most, the evidence showed that [he] was near the gun when Nava fired it which is not a basis for a conviction of possessing the gun." The People respond the evidence showed Lopez and the other three gang members in the car were in joint possession of the firearm. They highlight that Ramos drove Perez's

   car, suggesting the gang members had the right to exercise control over each other's possessions at the time of the shooting. We conclude sufficient evidence supports Lopez's conviction for possession of a firearm by a felon.

   Lopez does not dispute there was evidence from which the jury could conclude he was in the backseat of the car and the shots emanated from the backseat, supporting a conclusion he was in close proximity to and potentially had access to the gun. And we agree with his assertion his mere proximity or access to the gun, by itself, is insufficient to establish he possessed it. (See *People v. Bay* (2019) 40 Cal.App.5th 126, 132 [" 'mere proximity' or opportunity to access the contraband, 'standing alone, is not sufficient evidence of possession' "]; accord, *People v. Land* (1994) 30 Cal.App.4th 220, 225 [" '[d]ominion and control are essentials of possession, and they cannot be inferred from mere presence or access. Something more must be shown to support inferring of these elements. Of course, the necessary additional circumstances may, in some fact contexts, be rather slight' "]; *People v. Zyduck* (1969) 270 Cal.App.2d 334, 336 [same].)

   But we conclude the record here contains additional facts beyond Lopez's mere presence in the car or access to the firearm, which give rise to a reasonable inference he had constructive possession of it. As discussed *ante*, there was also evidence from which the jury could infer Lopez knew the gun was in the car and he facilitated its use; that is, he aided and abetted the shooting of E.D.'s car. The jury could have reasonably concluded as such based upon Lopez's and his codefendants' conduct before and after the shooting, Lopez's relationship to his codefendants, his gang affiliation, and the evidence of his interest or motive. Indeed, there was evidence Lopez was part of the initial verbal confrontation and escalated it into a physical confrontation. Based upon such evidence, in addition to the evidence of Lopez's access to the firearm based upon his presence in the car, we conclude a rational trier of fact could reasonably infer Lopez had the right to control the firearm. (See *People v. Land, supra*, 30 Cal.App.4th at p. 228 [evidence of defendant's presence in and access to stolen car coupled with evidence he and driver were friends, defendant knew car was stolen, and they used car for common criminal mission supported finding defendant had constructive possession of vehicle].) Accordingly, we conclude his conviction of possession of a firearm by a felon is supported by substantial evidence.

   We reject Lopez's second contention.

Lopez, 2022 WL 1596154, at *7–9.

   "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." Ngo, 651 F.3d at 1114 (internal quotation marks omitted) (quoting Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995)). As noted above, evidence of Petitioner's confrontational conduct leading up to the shooting, the previous attack against Petitioner by rival Sureño members and Petitioner's possible motive, his gang membership, his relationship with the other defendants, and the fact that E.D. was wearing rival gang colors all supported the jury's verdict that Petitioner aided and abetted the shooting. Based upon such evidence, in addition to the fact that Petitioner had access to the firearm by his presence in the backseat, it was not

18

objectively unreasonable for the state court to conclude that a rational trier of fact could reasonably infer Petitioner had the right to control the firearm. "The jury in this case was convinced, and the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality." Coleman, 566 U.S. at 656.

The Supreme Court has "made clear that Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman, 566 U.S. at 651. "When the deference to state court decisions required by § 2254(d) is applied to the state court's already deferential review," Cavazos, 565 U.S. at 7, the Court finds that the state court's decision denying Petitioner's sufficiency of evidence claim regarding possession of a firearm was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Petitioner has not demonstrated that "no 'fairminded juris[t]' could have reached the same judgment as the state court." Shinn v. Ramirez, 596 U.S. 366, 378 (2022) (alteration in original) (quoting Harrington, 562 U.S. at 102). Accordingly, Petitioner is not entitled to habeas relief on his second claim.

**V.**

**RECOMMENDATION & ORDER**

Based on the foregoing, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

Further, the Clerk of Court is DIRECTED to randomly assign this action to a District Judge.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the Court, **limited to fifteen (15) pages in length, including any exhibits**. Such a document should be captioned "Objections to Magistrate Judge's Findings and

Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **May 12, 2025**

STANLEY A. BOONE
United States Magistrate Judge